# EXHIBIT "D"

**Plaintiff Ana Margarita Martinez' Application for
Default Judgment Against Cuba**

FILE STAMP AND RETURN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ANA MARGARITA MARTINEZ,

      Plaintiff,

vs.

THE REPUBLIC OF CUBA,

      Defendant.

_____/

07 CIV 6607

## COMPLAINT

The Plaintiff, ANA MARGARITA MARTINEZ (hereinafter "Plaintiff"), hereby sues the

Defendant, THE REPUBLIC OF CUBA (hereinafter "Defendant" or "the Republic of Cuba"), and

alleges as follows:

### Nature of the Action

1.    This is an action of debt to enforce a state court judgment in favor of the Plaintiff, and

against the Defendant. On March 9, 2001, in the case styled as Ana Margarita Martinez v. The

Republic of Cuba, Case No. 99-18208 CA 20, a final judgment was entered by the Circuit Court of

the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, awarding Plaintiff

compensatory damages in the amount of $7,175,000.00. An exemplified copy of the March 9, 2001

final judgment is attached hereto at Exhibit "A". That judgment was amended by order dated March

23, 2001, which, in addition to the award of $7,175,000.00 in compensatory damages, further

awarded Plaintiff $20,000,000.00 in punitive damages (the "Judgment"). An exemplified copy of

the Judgment is attached hereto at Exhibit "B".

2.    The Judgment arose from the systematic and intentional physical, psychological and emotional torture inflicted upon Plaintiff by her husband, acting within the scope of his employment as an agent of the Cuban government. Pursuant to the waiver provisions of the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1602 et seq. ("FSIA"), the Republic of Cuba was, and is, responsible to pay compensatory damages to the Plaintiff. The Judgment was entered after the Florida state court gave the Republic of Cuba a full opportunity to participate in the proceedings before that court. Plaintiff now seeks the benefits of the Full Faith and Credit clause of Article IV, § 1 of the United States Constitution, as implemented by 28 U.S.C. § 1738.

**Jurisdiction and Venue**

3.    The Plaintiff is a citizen of the State of Florida.

4.    The Defendant is the Republic of Cuba, a foreign state within the meaning of 28 U.S.C. § 1603(a).

5.    This federal action is to enforce the Judgment, which finally resolved Plaintiff's claims against the Republic of Cuba for damages suffered as a result of the systematic and intentional torture by an agent of the Cuban government. In that action, the Florida Circuit Court had jurisdiction over the subject matter under the FSIA. Pursuant to the provisions of 28 U.S.C. § 1605, the Republic of Cuba was, and is, subject to suit in a court of competent jurisdiction in any state court in the United States.

6.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1330(a), as this is a non-jury civil action against a foreign state. The Republic of Cuba is not entitled to immunity from this action pursuant to 28 U.S.C. § 1605 because the Judgment was rendered as

2

a result of the torture by an agent of the Cuban Government acting within the scope of his employment.

7. Personal jurisdiction exists over the Defendant pursuant to 28 U.S.C. §§ 1605 and 1330(b).

8. Venue is appropriate in the Southern District of New York pursuant to 28 U.S.C. § 1391(f)(1) because a substantial part of the property of the Republic of Cuba that is the subject of this action is situated within this district.

<u>Count I:  Action on a Judgment</u>

9. The allegations of Paragraphs 1 through 8 are re-stated as though fully alleged herein.

10. The Judgment was entered for the Plaintiff on March 23, 2001, in the case known as Ana Margarita Martinez v. The Republic of Cuba, Case No. 99-18208 CA 20, for $7,175,000.00 in compensatory damages and $20,000,000.00 in punitive damages. See Ex. B.

10. The Judgment is a final disposition of the Plaintiff's claims against the Republic of Cuba.

11. Plaintiff received a payment on the Judgment on May 10, 2005, in the amount of $199,659.59. This amount was paid to Plaintiff by the United States Department of Treasury, Office of Foreign Asset Control, from frozen Cuban assets. In addition, in 2003 the Plaintiff executed upon and received the proceeds from the auction of a small biplane owned by the Cuban Government, in the amount of $7,000. The total amount of the principal of the Judgment which remains unsatisfied is $26,968,340.41.

12. In order to seek recovery of the $26,968,340.41 in remaining principal owed to Plaintiff, the Plaintiff hereby brings this action to enforce the Judgment, upon which she may execute

3

in this or another Federal District Court of the United States, against the Republic of Cuba and against any of its assets wherever situated.

13.    Pursuant to 28 U.S.C. § 1738, records of judicial proceedings of any state court "shall be proved or admitted in other courts within the United States and its Territories and Possessions by the attestation of the clerk and seal of the court annexed, if a seal exists, together with a certificate of a judge of the court that the said attestation is in proper form."

14.    Defendant may not raise any defenses to the underlying Judgment as to the merits of that suit. The Florida state court possessed proper jurisdiction over the matter, and this Court should properly enforce the Judgment.

15.    Plaintiff is entitled to a judgment from this Court based upon the Defendant's failure to satisfy the Judgment in its entirety.

16.    Plaintiff is entitled to pre-judgment interest from the date of the original judgment, entered on March 9, 2001, through the date of entry of this Court's judgment. Such interest should be calculated at the Florida statutory rate. In addition, Plaintiff is also entitled to post-judgment interest from the date of entry of this Court's judgment, calculated at the federal statutory rate.

WHEREFORE, Plaintiff respectfully requests that this Court issue a judgment in favor of Plaintiff, enforcing the Final Judgment entered in the matter of Ana Margarita Martinez v. The Republic of Cuba, Case No. 99-18208 CA 20, on March 23, 2001, and awarding Plaintiff $6,968,340.41 in compensatory damages, $20,000,000.00 in punitive damages, pre-judgment and post-judgment interest, and any other relief this Court deems just and proper.

Date: July 30, 2007

TEW CARDENAS LLP
Four Seasons Tower, 15th Floor, 1441 Brickell Avenue, Miami, Florida 33131-3407 • 305-536-1112

Respectfully submitted,

By: _____
Joseph A. DeMaria, Esq. (JD 5668)
jad@tewlaw.com
Bryan T. West, Esq. (BW 8739)
btw@tewlaw.com
**Counsel for Plaintiff**
Tew Cardenas LLP
1441 Brickell Avenue, 15th Floor
Miami, Florida 33131
Phone: 305.536.1112
Facsimile: 305.536.1116

@PFDesktop\::ODMA/MHODMA/DMS_NT;Miami;449050;2

5

# Exhibit "A"

☐ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.
☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.

| DIVISION | | CASE NUMBER |
|---|---|---|
| ☒ CIVIL<br>☐ CRIMINAL<br>☐ FAMILY<br>☐ TRAFFIC<br>☐ OTHER | **EXEMPLIFICATION** | *99-18208 CA 20* |
| **EXEMPLIFICATION OF:**<br><br>*FINAL JUDGMENT* | | **CLOCK IN** |

**I, HARVEY RUVIN,** Clerk of the Circuit and County Courts of the Eleventh Judicial Circuit of Florida, do hereby

Certify that I am the Custodian of Official Records for Miami-Dade County, Florida, and the attached document

is a certified copy therefrom.

In Witness Whereof, I have set my hand and affixed the seal of my office this *02* day of *JANUARY,*

20*07*.

_____
Harvey Ruvin, Clerk of
Circuit and County Courts
Miami-Dade County, Florida

_____
Senior Deputy Clerk
# *1012*

I, *STUART M. SIMONS*, Judge of the ☒ Circuit ☐ County Court in and for Miami-Dade County,

Florida, do hereby Certify that the Circuit and County Courts of the Eleventh Judicial Circuit have a Clerk of Courts

and an authenticating seal for his office . Furthermore, that **HARVEY RUVIN** is the Clerk of Courts for the Eleventh

Judicial Circuit of Florida and the custodian of the records thereof.

Witness my hand and Official Signature this *02* day of *JANUARY* ,20*07*.

JAN 0 2 2007

_____
Judge Stuart M. Simons
Judge

CLK/CT 138   Rev. 5/03

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO. 99-18208 CA 20

ANA MARGARITA MARTINEZ,
      Plaintiff,

vs.

THE REPUBLIC OF CUBA,
      Defendant.

_____/

**FINAL JUDGMENT**

RECORDED
MAR 13 2001
Clerk of Circuit
& County Courts

## I. INTRODUCTION

In February of 1992, the government of Cuba sent its agent, Pablo Roque, a trained spy, to the shores of Guantanamo, claiming to be a high ranking defector from Cuba .

After being debriefed at Guantanamo, Cuba, Roque came to Miami in March 1992 and began dating the plaintiff shortly thereafter.

He met the plaintiff at a church sponsored function during May 1992.  He began attending the same church as the plaintiff and she saw him regularly at religious services and church functions.

Under orders from Cuba, Roque pursued the plaintiff and dated her for several years before marrying her.

During that time, Roque, used his relationship to infiltrate the local exiled Cuban community in Miami.

1

OFF. REC BK.
19539 PG 2007

TRUE COPY
CERTIFICATION ON LAST

The plaintiff was an unwilling pawn used by Roque to establish a creditable cover for his covert espionage activities on behalf of the Cuban Government.

This case is about the family he devastated and the woman he sexually battered, through his fraud, resulting in her having severe permanent psychological injuries.

This is a one count complaint alleging sexual battery based on fraud or fraudulent inducement. Because Roque did not have Ms. Martinez's informed consent to having marital relations; under Florida law, Roque's actions constituted a sexual battery and rape of Mrs. Martinez.

All along, Ms.Martinez was unaware that the man that she had fallen in love with was acting under orders from Cuba. She believed that Roque shared her anti-communist ideals. She believed that he was a brave man who by joining the pro-democracy organization, Brothers to the Rescue, shared her desire to assuage the treacherous plight of rafters fleeing the Communist island.

The Court finds that Roque acted within the scope of his employment when he sexually battered and wronged Mrs. Martinez. The Republic of Cuba, therefore, is not immune from the jurisdiction of this Court.

In every civil law suit there are two parts: liability and damages. A default judgement was entered against the Defendant, the Republic of Cuba and its agents - spies, who they are vicariously liable for.

The Court proceeded to hold a trial on damages on February 20 and 21, 2001.

## II    FINDINGS OF FACT

At trial, Plaintiff, presented testimonial and documentary evidence in support of her claim.

2

OFF. REC BK.

19539 PG 2008

 A TRUE COPY
CERTIFICATION ON LAST

Because Cuba has presented no defense, the Court will accept as true the plaintiff's uncontroverted factual allegations.

Juan Pablo Roque swam to the U.S. Military base in Guantanamo, Cuba, during February 1992 claiming to be a high ranking military defector from Cuba. Before ostensibly defecting to the United States, Roque was a Soviet-trained Cuban military officer.

After being debriefed by U.S. officials in Guantanamo, Roque arrived in Miami during March 1992. He began attending the same church as Ms. Martinez. She saw him regularly at religious services and church events. They met formally at a church sponsored event during May 1992 and began dating shortly thereafter.

Acting on instructions from Cuba, Roque pursued Ms. Martinez and dated her for approximately three years before marrying her. During that time, Roque established himself as a presumed anti-Communist member of the Cuban exile community at Miami. The entire time, Ms. Martinez was unaware that Roque was using her as an unwitting pawn to legitimize his presence in Miami by establishing a credible cover for his covert espionage activities on behalf of the Cuban Government.

Ms. Martinez was cautious in allowing Roque into her life and the lives of her children. She had been hurt by previous relationships and was careful about starting a new one. She was concerned about protecting her children and avoiding having them hurt. She had been married twice before and her children were from her second marriage.

Aided by the cover provided by his relationship with Ms. Martinez, Roque infiltrated Miami-based organizations that have humanitarian missions directed toward Cuba or desire democracy for Cuba. He gained admission into exile organizations and even obtained the

3

OFF. REC BK.

19539 PG 2009



A TRUE COPY
CERTIFICATION ONLY

sponsorship of the Cuban American National Foundation in publishing a book he wrote called "Desertor" ("The Deserter"). The book describes Roque's life in Cuba and his military career.

During 1994, Roque joined the "Hermanos al Rescate" or "Brothers to the Rescue" ("Brothers") organization in Miami.   As a former MIG fighter pilot with the rank of Major in the Cuban Air Force, Roque joined Brothers as one of its flyers. He flew on many scouting missions with the Brothers.

Information regarding Roque and the Cuban Government's activities comes from testimony at trial as well as over 1,400 pages of communiques of a Miami-based Cuban spy ring seized by the FBI in connection with its arrest of members of the spy network. The Court took judicial notice of this exhibit. These documents reveal Cuban agents spy tactics and techniques as well as their missions and activities.   The once-secret reports confirm the existence of a Cuban spy ring known as "La Red Avispa" or "Wasp Network." This covert organization received detailed instructions from their Cuban homeland, which controlled their every move.  These individuals, including Roque had a mission to infiltrate this community.

On February 22, 1996 Roque told Ms. Martinez that he was leaving on a business trip. That evening, he packed and left home at 3:00 a.m. on February 23, 1996. He abandoned Ms. Martinez and her children and they have never seen him again at home in the United States.

Two day later, on Monday February 26th, Roque appeared on CNN being interviewed in Havana, Cuba. The CNN interview was the means by which Ms. Martinez discovered the whereabouts of her missing husband. In the interview, Roque returned to Cuba claiming he was disillusioned with life in the United States and alleging that the Brothers to the Rescue organization was actually a terrorist group.

4

OFF. REC BK.

19539PG2010

A TRUE COPY
CERTIFICATION ON LAST

Ms. Martinez was emotionally distraught and devastated by the revelation. Betrayed and alone, she suffered the criticism of some members of the local Cuban-American community who doubted her sincerity or disbelief.

Some members of the local community ostracized Mrs. Martinez, mistakenly suspecting that she might have known her husband was a Cuban spy. She allegedly was accused on some radio programs of conspiring with Roque. Oftentimes, she overheard comments like "that's the wife of the spy." It was difficult for Ms. Martinez to go anywhere without being recognized and, in some instances, vilified. For example, one of the relatives of the murdered "flyers" asked Ms. Martinez to leave a memorial service and told her that she was under suspicion and not welcomed at the service. This was devastating to Ms. Martinez because, apart from the personal pain and betrayal she experienced, she also grieved the loss of those four lives. Ms. Martinez had her marriage annulled on October 15, 1996 based on gross fraud. (Case No. 96-10154, Roque vs. Roque, Circuit Court of Dade County.)

In 1998, the U.S. Attorney's office in Miami indicted the fugitive Roque and others as part of a ring of Cuban spies operating here in South Florida, (U.S. v. Gerardo Hernandez, et al., (United States District Court, Southern District of Florida, Miami Division Case No. 98-721 CR LENARD.) According to the indictment, Roque's mission had been to infiltrate the Brothers on behalf of the Cuban Directorate of Intelligence (The "DI") as part of a network of Miami-based illegal officers and agents known as "La Red Avispa" ("The Wasp Network").

Carlos Cajaraville, a former Spy in the Cuban Directorate of Intelligence, testified at length about the extensive training in espionage techniques and psychological profiling and control that Cuban Spies, including Roque, receive prior to entering the United States. Mr.

5

OFF. REC BK.

19539PG2011

 A TRUE COPY
CERTIFICATION ON LAST

Cajaraville served 25 years in the Cuban intelligence and counterintelligence service. During that period, one of his duties was to train spies. Mr. Cajaraville testified that the extensive training allowed Roque to purse Ana Margarita Martinez as a necessary prey in his covert mission, without ever alerting her to his true identity. The training would allow Roque to exert a great deal of dominion and control over Ms. Martinez's life.

### III. COMPENSATORY DAMAGES

To support her claim for compensatory damages, Plaintiff presented the testimony of Dr. Eli Levy, a psychologist, who testified that Ms. Martinez has suffered great debilitating emotional trauma as a result of Roque's actions. She required medical and psychological care and was left saddled with debts (not put into evidence) incurred by Roque while he was married to her. She will continue to require psychological therapy in the future and so will her children, for which she is financially responsible. Dr.Levy testified that Ms. Martinez's damage and emotional scarring is irreparable and permanent.

Dr. Levy testified that Ms. Martinez was extremely cautious in allowing Roque into her life and the lives of her children.

That she was a good mother, she was extremely protective for her children and concerned for their well-being.

That Ms. Martinez was totally unprepared for and unable to prevent, however, was the insidious and calculated manner in which Roque slithered into her life. They met at Church sponsored events. He was in a bible studies class with her where she attended weekly for several months before she began dating him. Roque's cousin - whom she also met at the same Church,

6

OFF. REC EK.

1 9539 PG 20 1 2

TRUE COPY CERTIFICATION ON 

was and FBI agent and introduced them to each other.

For all she could perceive, Roque was an upstanding and trustworthy member of our community. She could hardly imagine that he was under orders to use her as a pawn in a game of international espionage and sabotage.

According to Dr. Levy, the impact on her and her children of having been in such danger and used in such a deliberate and calculated manner was severe and permanent. No economics was put before the court in terms of future medicals.

This Court is especially offended that Cuba – a country that disregards human rights – has callously trampled the rights of one of our own citizens on our own soil in furtherance of a vile criminal conspiracy. Roque escaped back to Cuba and beyond the reach of our justice. If not for this lawsuit, Cuba too would escape accountability for sending Roque and others illegally to our country and intentionally harming one of our citizens.

The trial record attests to the trauma and grief that the Plaintiff has experienced and the permanent emotional scarring that the Plaintiff will endure for the rest of her life. Especially troubling to this Court is Dr. Levy's testimony that it is his belief that Ms. Martinez may gradually withdraw from society altogether and into a shell once her children reach maturity and leave the home. Dr. Levy stated that Ms. Martinez appeared to be a "survivor", and that she "survived" to care for her children, but that in all other respects, she felt her life to be over. The court finds this evidence compelling and sufficient to justify an award for pain and suffering, which is included in the award.

Congressman Peter Deutsch also testified. He stated that Cuba was a terrorist state and that what Roque did at the control and direction of the Republic of Cuba was an act of torture.

7

OFF. REC EK.

19539PG2013

 TRUE COPY
CERTIFICATION ON LAST

The plaintiff, through counsel, introduced the "Mortality Tables" which showed that Ms. Martinez has a life expectancy of approximately 41 years.

## IV. Conclusions of Law

This Court entered a default against the Republic of Cuba on June 22, 2000. Because this is a lawsuit against a foreign state, and a default has been entered, the claimant must establish her "claim or right to relief by evidence that is satisfactory to the Court." 28 U.S.C. § 1608 (e). This case proceeded to trial on February 20, 2001.

During the trial, the Plaintiff has presented thorough, competent, and extensive evidence, both testimonial and documentary, in support of her claim. This Court finds that the Plaintiff, Ana Margarita Martinez has been damaged by the actions of Juan Pablo Roque. This Court also finds that Roque was an agent of the Republic of Cuba acting within the scope of his employment, and that the defendant is responsible for Ms. Martinez's damages.

### A. Jurisdiction

This Court has jurisdiction over the subject matter of this cause pursuant to the terms of 28 U.S.C. §§1330 and 1331 as Plaintiff's claims are brought pursuant to the Foreign Sovereign Immunities Act of 1976 ("FSIA"), 28 U.S.C.A. §§ 1605. See generally, Patterson Zochonais (U.K.) Ltd. vs.. Compania United Arros, S.A.U, 493 F. Supp. 621 (D.C.N.Y. 1980).

Plaintiff served the Republic of Cuba with the Complaint through diplomatic channels, as required by law. Cuba elected not to defend the suit and asserted in a diplomatic note that the Courts in the United States have no jurisdiction over Cuba. That assertion is wrong. Cuba's agent escaped back to Cuba and beyond the reach of our justice, but our laws make Cuba accountable for the civil wrongs he committed.

8

OFF. REC BK.

19539 PG 2014

TRUE COPY
CERTIFICATION ONLY

A Court has subject matter jurisdiction to hear a claim against a foreign state if the claim

falls within one of the FSIA's enumerated exceptions. See Saudi Arabia vs. Nelson, 507 U.S.

349,355 (1993). There are two enumerated exceptions that apply in this case that confer

jurisdiction in this Court.

The first exception exists under 28 U.S.C. § 1605 a (7), which provides:

> (a)    A foreign state shall not be immune from the jurisdiction of courts of
>
>        the United States or of the States in any case –
>
> ...
>
> (7)    ... in which money damages are sought against a foreign state for personal

injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage,

hostage taking, or the provision of material support or resources (as defined in section 2339A of

title 18) for such an act if such act or provision of material support is engaged in by an official,

employee, or agent of such foreign state while acting within the scope of his or her office,

employment, or agency, except that the court shall decline to hear a claim under this paragraph –

> (A)    if the foreign state was not designated as a state sponsor of
> terrorism under section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App.
> 2405(j) or section 620A of the Foreign Assistance of 1961 (>22 U.S.C. 2371) at the time
> the act occurred, unless later so designated as a result of such act; and
> (B)    even if the foreign state is or was so designated, if –
> (i)    the act occurred in the foreign state against which the claim has
> been brought and the claimant has not afforded the foreign state a reasonable
> opportunity to arbitrate the claim in accordance with accepted international rules
> of arbitration; or
> (ii) neither the claimant nor the victim was a national of the United States

(as that term is defined in section 101(a)(22) of the Immigration and Nationality Act)

when the act upon which the claim is based occurred.

9

OFF. REC BK.

19539 PG 2015

A TRUE COPY
CERTIFICATION ON LAST

Pursuant to the above, a foreign state is not immune from the jurisdiction of this Court if an American is <u>tortured by the agent of a foreign state acting within the scope of his employment</u>. In respect to that, this Court finds based on the testimony of Congressman Deutsch that Ms. Martinez was the victim of a torture intentionally inflicted upon her by an agent of the Cuban Government acting within the scope of his employment.

Cuba is designated to be a state sponsor of terrorism under the terms and provisions of 56(j) of the Export Administration Act of 1970, 50 U.S.C. § 2405 (g) of the Foreign Assistence Act of 1961, 22 U.S.C. § 2371. Ms. Martinez is an American Citizen, and the wrongs against her occurred in this country.

Roque and the Cuban Government knew or should have known that Ms. Martinez would ultimately suffer great anguish and emotional distress from having been used and abused in such a calculated manner. Nevertheless, they used her for their twisted purpose and thereby intentionally inflicted the severe mental pain and suffering that she endured and will continue to experience.

This Court finds that Cuba is not immune from jurisdiction and therefore liable to Ms. Martinez to 28 U.S.C. § 1605 a (7) as a victim of a systematic and intentional torture inflicted upon her while under the control of an agent of the Cuban Government acting within the scope of his employment. This Court finds that act of "torture" to fall within the meaning given that term in section 3 of the Torture Victim Protection Act of 1991.

This Court finds that Juan Pablo Roque injured Ms. Martinez while in the course of providing material support or resources to the Cuban Government.

The second exception to sovereign immunity exists if a foreign state commits certain tortious acts within the United States. In that respect, 28 U.S.C. § 1605 a (5) provides:

CFF. REC BK.                    10

19539 PG 2016


TRUE COPY
CERTIFICATION ON LAST

(a)    A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case --

...

(5) ... in which money damages are sought against a foreign state for <u>personal injury</u> or death, or damage to or loss or property, <u>occurring in the United States and caused by the tortuous</u> act or omission <u>of that foreign state or of any</u> official or <u>employee of that foreign state</u> while acting within the scope of his office or employment; except this paragraph shall not apply to –

(A) and claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused, or

(B) any claim arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights;

This is a <u>Sexual Battery under our law</u> qualifies to remove a foreign state's claim to immunity from suit in the U.S. This is one such tortuous act that court finds that Cuba is not immune from jurisdiction and is liable to Ms. Martinez pursuant to 28 U.S.C. § 1605 a (5).

Although Ms. Martinez was obviously deceived here, the tortious act for which Cuba is vicariously liable is not the deceit itself, but the <u>battery</u> committed by Roque. The tort of battery arises from the lack of consent to a touching given to the torfeasor by the tort victim. Pursuant to Florida Law, Ms. Martinez's consent at the time to having sexual relations with Roque is invalid and, therefore, Roque's actions constitute a battery. It is on this basis that the Appellate Court in <u>Hogan v. Tavzel</u>, 660 So.2d 350 (Fla 5th DCA 1995) reversed the decision of the trial Court and allowed Carolyn Hogan to pursue a claim of battery against her former husband. See also, <u>Wheeland vs. Wheeland</u>, Case No. 93-9072, (Dade County Circuit Court). Roque's deceit and misrepresentation in pursuing Ms. Martinez may also amount to other torts, but these are not separately actionable against Cuba under 28 U.S.C.§ 1605 a (5).

Congress has declared that the Cuban government threatens international peace and

11

OFF. REC BK.

19539 PG 2017

TRUE COPY
CERTIFICATION ONLY



security by engaging in acts of armed subversion and terrorism such as the training and supplying of groups dedicated to international violence.  See generally, Foreign Assistance Act of 1961, 22 U.S.C. §2151.  Congressman Peter Deutsch, testified at length about his role in enacting legislation aimed at continuing this nation's strong stance against terrorist acts against our citizens. He testified that he believes Ana Margarita Martinez to be the victim of a terrorist act, as well as an act of torture. Congressman Deutsch testified about Cuba's deplorable human rights record and that Cuba is designated to be a state sponsor of terrorism under the terms and provisions of 56 (j) of the Export Administration Act of 1979, 50 U.S.C. § 2405 (g) of the Foreign Assistance Act of 1961, 22 U.S.C. § 2371.

This action is for damages in excess of this Court's minimum jurisdictional limits of Fifteen Thousand Dollars and 00/100 ($15,000.00), exclusive of costs and interest.

### B. Vicarious Liability of the Republic of Cuba

Cuba controlled Roque's every move and every significant action taken by Roque from February 1992, when he arrived in South Florida, through February 1996, when he was retrieved by Cuba. He was under the direction and control of the Republic of Cuba at all times.

In furtherance of his mission, Roque pursued, dated and married Ms. Martinez and consummated that marriage. Accordingly, Roque was an agent and employee of the government of Cuba and was acting within the scope of his employment and in furtherance of the aims and objectives of Cuba when he wronged Ms. Martinez. See Archer v. Trans/American Servs., Ltd., 834 F.2d 1570, 1573 (11th Cir. 1988); Restatement (Second) of Agency § 1 (1958) (defining agency relationship).

The claim of vicarious liability was bolstered by the testimony of Carlos Cajaravilla, an

12
CFC REC BK.

19539 PG 2018   A TRUE COPY
CERTIFICATION ON LAST

expert in Cuba Counterintelligence and former Cuban Counterintelligence Official, Mr.

Cajaraville detailed how the Cuban government orchestrates absolutely every aspect of a spy's

daily life.

A telling and troubling example of the degree of control the Cuban Government exerted

over Roque's life is contained within the text of a communication between Roque's handler (code

name "A-4") and the Cuban Government. Roque met with the handler at the McDonald's

Restaurant on US-1 and 32nd Avenue on December 1994 – months before he was scheduled to

marry Ms. Martinez. Roque (code name "German") requested to return to Cuba before his

forthcoming wedding. Relevant text from the handler's communique follows:

> "He says he wants to leave before the wedding (March), one way or another,
> because he can not do that to Amelita. He doesn't even want to talk to her because
> he doesn't know what he's going to tell her. He insisted that he wants to go, one
> way or another."

It appears that Roque may have had personal misgivings about moving forward with the

sham marriage. Evidently, he was worried about upsetting a paramour, Amelita, back in Cuba by

marrying another woman here in Miami. Nevertheless, he was ordered to stay in Miami and

proceed with his mission as instructed.

### C. An Act of Terrorism

The Cuban Government has followed a systematic practice of waging a war of terrorism

against citizens of the United States. Congressman Peter Deutsch testified during trial that the

U.S. Congress has condemned the actions of the Cuban Government in shooting down the

defenseless planes of Brothers to the Rescue:[1]

---

[1]     **22 U.S.C. § 6046. Condemnation of Cuban attack on American aircraft**
(a)     Findings

13

OFF. REC BK.

19539PG2019   A TRUE COPY
CERTIFICATION ONLY

Congressman Deutsch also testified that the U.S. Government has steadfastly supported the effort of the Cuban people to obtain freedom from the totalitarian stranglehold of Castro's regime:

---

The Congress makes the following findings:

(1)    Brothers to the Rescue is a Miami-based humanitarian organization engaged in searching for and aiding Cuban refugees in the Straits of Florida, and was engaged in such a mission on Saturday, February 24, 1996.

...

(3)    Statements by the Cuban Government that Brothers to the Rescue has engaged in covert operations, bombing campaigns, and commando operations against the Government of Cuba have no basis in fact.

...

(10)    The response chosen by Fidel Castro, the use of lethal force, was completely inappropriate to the situation presented to the Cuban Government, making such actions a blatant and barbaric violation of international law and tantamount to cold-blooded murder.

...

(14)    This premeditated act took place after a week-long wave of repression by the Cuban Government against Concilio Cubano, an umbrella organization of human rights activists, dissidents, independent economists, and independent journalists, among others.

(b)    Statements by Congress

(1)    The Congress strongly condemns the act of terrorism by the Castro regime in shooting down the Brothers to the Rescue aircraft on February 24, 1996.

**22 U.S.C. 6001. Cuban Democracy Act of 1992**

The Congress makes the following findings:

(1)    The government of Fidel Castro has demonstrated consistent disregard for internationally accepted standards of human rights and for democratic values ...

(2)    The Cuban people have demonstrated their yearning for freedom and their increasing opposition to the Castro government by risking their lives in organizing independent, democratic activities on the island and by undertaking hazardous flights for freedom to the United States and other countries.

(3)    The Castro government maintains a militar-dominated economy that has decreased the well being of the Cuban people in order to enable the government to engage in military interventions and subversive activities throughout the world and, especially, in the Western Hemisphere. These have included involvement in narcotics trafficking and support for the FMLN guerrillas in El Salvador.

·14

OFF REC BK.

19539PG2020   A TRUE COPY
CERTIFICATION ON LAST PAGE

The U.S. Government considers the Cuban Government to be a state sponsor of terrorism

and a threat to this country and international peace:[3]

---

(4)      There is no sign that the Castro regime is prepared to make any significant concessions to democracy or to undertake any form of democratic opening. Efforts to suppress dissent through intimidation, imprisonment, and exile have accelerated since the political changes that have occurred in the former Soviet Union and Eastern Europe.

[3]     **22 U.S.C. § 6022. Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996**

The purposes of this chapter are –

...

(3) to provide for the continued national security of the United States in the face of continuing threats from the Castro government of terrorism, theft of property from United States nationals by the Castro government, and the political manipulation by the Castro government of the desire of Cubans to escape that results in mass migration to the United States;

**22 U.S.C. § 6021. Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996**

The Congress makes the following findings:

...

(8) The consistent policy of the United States towards Cuban since the beginning of the Castro regime, carried out by both Democratic and Republican administrations, has sought to keep faith with the people of Cuba, and has been effective in sanctioning the totalitarian Castro regime.

(9) The United States has shown a deep commitment, and considers it a moral obligations, to promote and protect human rights and fundamental freedom as expressed in the Charter of the United Nations and in the Universal Declaration of Human Rights.

...

(14)    The Castro government threatens international peace and security by engaging in acts of armed subversion and terrorism such as the training and supplying of groups dedicated to international violence.

(15)    The Castro government has utilized from its inception and continues to utilize torture in various forms (including by psychiatry), as well as execution, exile, confiscation, political imprisonment, and other forms of terror and repression, as mean of retaining power.

...

(28)    For the past 36 years, the Cuban Government has posed and continues to pose a national security threat to the United States.

15

A TRUE COPY
OFF. REC EX.
CERTIFICATION ON LAST

I9539PG202I

Congressman Deutsch also testified that he believes Ana Martinez to be the victim of a terrorist and torturous act.

This Court finds that as the unwitting victim in a plot among terrorists that was targeted, used, and injured in furtherance of acts of international terrorism, Ms. Martinez herself is the victim of a terrorist act.

The Plaintiff has a substantive cause of action under a 1996 statute entitled Civil Liability for Acts of State Sponsored Terrorism, Pub.L. 104-208, div. A, title I, Sec. 101(c)(title V, Sec. 589), Sept. 30, 1996, 110 Stat. 3009-121, 3009-172 ("Civil Liability Act"). This law was codified as a note to 28 U.S.C. § 1605 a (5):

(a) an (sic) official, employee, or agent of a foreign state designated as a state sponsor of terrorism designated (sic) under section 6(j) of the Export Administration Act of 1979 (50 App. U.S.C. § 2405(j)) while acting within the scope of his or her office, employment, or agency shall be liable to a United Sates national or the national's legal representative for personal injury or death caused by acts of that official, employee, or agent for which the courts of the United States may maintain jurisdiction under section 1605(a)(7) of title 28, United States Code, for money damages which may include economic damages, pain, and suffering, and punitive damages if the acts were among those described in section 1605(a)(7).

The Civil Liability Act makes an agent of a terrorist state liable to American Citizens wronged by the agent in the manner described in section 1606(a)(7) of title 28, United States Code. The terrorist state employing the agent is also liable under the theory of respondent

---

16

CFF. FED BK.

A TRUE COPY
CERTIFICATION ON LAST

19539PG2022

superior.

**D. Cuba is Liable Under 28 U.S.C. § 1605 a (7) for the Intentional Torture of** Ms.

Martinez

This Court finds that Ms. Martinez was the victim of a cruel and heinous "torture"

fraudulently induced and intentionally inflicted upon her by an agent of the Cuban Government

acting within the scope of his employment. Ms. Martinez has endured severe mental pain and

suffering resulting from the sham relationship and marriage pursued by Roque in the course of

establishing his cover as a spy in our community under Cuba's direction. Her two young children

have also been damaged, and this damage intensifies Ms. Martinez's own pain, suffering and

regret.

This court finds that Roque and the Cuban Government necessarily knew or should have

know that Ms. Martinez would ultimately suffer great anguish and emotional distress from having

been used and abused in such a despicable manner. They nevertheless exploited her for their

twisted purpose and thereby intentionally inflicted the severe mental pain and suffering that she

endured and will continue to experience as a result of this for the next 4 1years.

That Ms. Martinez was unaware of her plight at the time it was occurring does not

minimize the severity of the transgression against her or the damage wrought from it. The

drugged victim of a "date rape" may not be aware of her plight at the time it occurs, but the

aftermath – when she subsequently discovers the act – is no less severe and the crime perpetrated

against her no less a violation.

This Court finds that Cuba is not immune from jurisdiction and is liable to Ms. Martinez

pursuant to 28 U.S.C. § 1605 a (7) because she is a victim of a systematic and intentional torture

17

TRUE COPY
CERTIFICATION ONLY

OFF. REC BK.

19539PG2023

inflicted upon her while under the physical control of an agent of the Cuban Government acting within the scope of his employment.

### E. Cuba is Liable Under 28 U.S.C. § 1605 a (5) for the Sexual Battery of Ms. Martinez

This court finds that pursuant to Florida law, sexual intercourse between Roque and Martinez was not consensual. Her dignity and person were callously and intentionally violated by Roque.

One must give knowing consent to sexual intercourse, and by operation of law, consent is vitiated if it is procured by fraud or concealment. See Hogan v. Tavzel, 660 So.2d 350 (Fla. App. 5 Dist. 1995), Wheeland vs. Wheeland, (Case No. 93-9072, Dade County Circuit Court, 1993.)

Similarly, Ms. Martinez's consent to having sexual relations with Roque was given without her knowledge that Roque was using her to establish cover for his mission on behalf of Cuba. Accordingly, Martinez's consent is the equivalent of no consent and Roque's actions constitute a battery, a sexual battery.

Other authorities also conclude that a cause of action in battery will lie, and consent will be ineffective, if the consenting person was mistaken about the nature and quality of the invasion intended. See, Prosser and Keeton, n. 105, S 18 at 119-20; 1986 U.Il.L.Rev. 779 Paul Murray & Brenda J. Winslett, "The Constitutional Right to Privacy and Emerging Tort Liability for Deceit in Interpersonal Relationship."

Under 28 U.S.C. § 1605 (a) (5) subject matter jurisdiction is established when three elements are satisfied:

1.    personal injury was caused by the tortious act or of any employee of that

18

OFF. REC BK.          A TRUE COPY
CERTIFICATION ONLY

19539PG2024

foreign state while acting within the scope of his employment;

2.    the act occurred in the United States; and

3.    the claim does not arise out of malicious prosecution, abuse of process,

libel, slander, misrepresentation, deceit, or interference with contract rights.

The requirements of 1605(a)(5) have been met in this case, and the Court has subject

matter jurisdiction over this action:

1.    Ms. Martinez was deceived by Roque as to his motives for dating and marrying

her, and her consent to date, marry, and have intimate physical relations with him

was fraudulently procured. Because he deceived her and did not have Martinez's

informed consent, under Florida law Roque's actions were a sexual battery and

rape of Martinez. Hogan v. Tavzel, 660 So.2d 350 (Fla. 5th DCA 1995)

Wheeland, supra. In establishing a cover for his clandestine mission, Roque was

acting within the scope of his employment as a covert agent for the Cuban

Government;

2.    Roque's sexual battery and rape of Martinez occurred in the United States; and

3.    Although Martinez's consent was procured through misrepresentation, fraud, and

deceit, the tortious act for which Cuba is vicariously liable is not the deceit itself

but the sexual battery committed by Roque as part of his clandestine mission to

establish a credible cover in order to infiltrate a Miami-based Cuban Government

organization.

This Court finds that Roque's deception at the direction of his employer nullifies any

consent given by Martinez to having sexual relations with Roque. Ms. Martinez did not give

19

OFF. REC. BK.

TRUE OF
CERTIFICATION ONLY

19539PG2025

knowing consent to sexual intercourse with a Cuban spy. Ms. Martinez was unaware.

There is no question that the damage and injury caused by Roque on behalf of Cuba damaged not only Ms. Martinez, but her two young children as well. Ms. Martinez's daughter, Sasha, testified how Roque became a father figure to her and how deeply she was hurt and how her relationship with her mother was damaged by Roque's abandonment.

The Court can hardly fathom how dreadful the suffering must be for a mother who has witnessed harm caused to her children in such a cruel manner. As Dr. Levy testified, this magnifies and intensifies Ms. Martinez's own pain, suffering and regret. In its award, however, the Court has not included the damage caused to the children, as they are not parties to this suit.

At the conclusion of the trial, the Plaintiff moved this Court to consider the issue of sanctions and punitive damages against the Defendant. This Court finds that there is ample evidence presented regarding the intentional, outrageous, and egregious nature of the Defendant's conduct with respect to the Plaintiff. Although the Civil Liability Act provides that punitive damages can be awarded against the agent of the terrorist state, 28 U.S.C. § 1606 (1976) prohibits a Court from awarding punitive damages against a foreign state:

As to any claim for relief with respect to which a foreign state is not entitled to immunity under section 1605 or 1607 of this chapter, the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances; but a foreign state except for an agency or instrumentality thereof shall not be liable for punitive damages; if, however, in any case wherein death was caused, the law of the place where the action or omission occurred provides, or has been construed to provide, for damages only punitive in nature, the foreign state shall be liable for actual or compensatory damages measured by the pecuniary injuries resulting

TRUE COPY
CERTIFICATION ONLY

OFF. REC BK.

19539PG2026

from such death which were incurred by the persons for whose benefit the action was brought.

Although this Court finds the conduct of the Cuban Government repugnant and contemptible and reprehensible and worthy of punitive measures, in the amount of $20 million dollars, the Court is constrained from awarding said punitive damages. Accordingly, no punitive damages may be awarded in this Judgment. See 28 U.S.C. § 1606 (1976).

Accordingly, the Court issues this Final Judgment as to Liability by the Defendant and Compensatory Damages are awarded against it in favor of the Plaintiff. This Court retains jurisdiction over the parties, however, for further proceedings on the issues of sanctions that it may consider awarding if available under the law against the Defendant.

The award of this Court can̲ not̲ restore neither Ms. Martinez's peace of mind nor the inviolability of her family. This Court cannot prevent Cuba and other terrorist nations from clandestinely infiltrating our society and cavalierly disregarding the right of our citizens. This Court can, however, give Cuba pause to consider the cost of having our citizens used and abused and holding them accountable in our Courts for their wrongful acts. With hope, in the future that cost will weigh heavily in the conscience of those responsible for this unconscionable act.

The Court is mindful of the recent trial before U.S. District Judge James Lawrence King in the cases involving three horrific deaths. These cases resulted in awards of approximately 16 million dollars per decedent for compensatory damages.[4]

The Court is also mindful that other courts have awarded compensatory damages to individuals who were fraudulantly induced to engage in sexual relations. See Hollingsworth v. The

---

[4]Alejandre, et al. vs. Republic of Cuba, et al., Case No. 96-10126-CIV- KING (United States District Court, Southern District of Florida, December 17, 1997).

21

A TRUE COPY
CERTIFICATION ONLY

OFF, REC EX.

19539PG2027

Phone Doctor, Inc., 1989 WL 527357 (Pinellas County Circuit Court, 1989) (plaintiff awarded $350,000 compensatory damages for sexual battery); Wheeland v. Wheeland, supra, (plaintiff who was infected with HIV by defendant who fraudulently concealed her HIV status was awarded 8 million dollars in compensatory damages).

The Court notes that punitive damages were also awarded in Hollingsworth and Wheeland; however, due to the prohibition against the award of punitive damages expressed in 28 U.S.C. § 1606, the Court may not rely on the punitive awards in those cases as a basis for affording relief in this case.

Albeit repetitive, the Court is outraged by the defendant Cuba's conduct and would have awarded 20 million in punitive damages if it could.

After careful review of the record, and the Court being otherwise fully advised, it is

ORDERED AND ADJUDGED that judgment is hereby granted on behalf of Plaintiff, Ana Margarita Martinez and against the Defendant, the Republic of Cuba for compensatory damages of $175,000.00 per year for 41 years for a total of $7,175,000.00 for which sum execution may issue forthwith against the Defendant, the Republic of Cuba and against any of their assets wherever situated. The Court will retain jurisdiction to enforce this judgment or any matters pertaining thereto.

DONE AND ORDERED at the Circuit Court of the 11th Judicial Circuit in Miami-Dade County, Florida this 9th day of March, 2001.

Alan L. Postman
Circuit Court Judge

cc:    Republic of Cuba
       Scott W. Leeds, Esq.
       Fernando J. Zulueta, Esq.

DEC 2 7 2006
STATE OF FLORIDA, COUNTY OF DADE
I HEREBY CERTIFY that the foregoing is a true and correct copy of the
original file in this office DEC 2 7 2006 AD 20
HARVEY RUVIN, Clerk of Circuit and County Courts
Deputy Clerk

19539PG2028

# Exhibit "B"

| ☐ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.<br>☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA. | | |
|---|---|---|
| **DIVISION**<br>☒ CIVIL<br>☐ CRIMINAL<br>☐ FAMILY<br>☐ TRAFFIC<br>☐ OTHER | **EXEMPLIFICATION** | **CASE NUMBER**<br><br>99- 18208 CA 20 |
| **EXEMPLIFICATION OF:** | AMENDED<br>FINAL JUDGMENT | **CLOCK IN** |

**I, HARVEY RUVIN,** Clerk of the Circuit and County Courts of the Eleventh Judicial Circuit of Florida, do hereby

Certify that I am the Custodian of Official Records for Miami-Dade County, Florida, and the attached document

is a certified copy therefrom.

In Witness Whereof, I have set my hand and affixed the seal of my office this 23RD day of MAY ,

20 07 .

Harvey Ruvin, Clerk of
Circuit and County Courts
Miami-Dade County, Florida

Senior Deputy Clerk
# 1012

I, STUART M. SIMONS , Judge of the ☒ Circuit ☐ County Court in and for Miami-Dade County,

Florida, do hereby Certifiy that the Circuit and County Courts of the Eleventh Judicial Circuit have a Clerk of Courts

and an authenticating seal for his office . Furthermore, that **HARVEY RUVIN** is the Clerk of Courts for the Eleventh

Judicial Circuit of Florida and the custodian of the records thereof.

Witness my hand and Official Signature this 23RD day of MAY ,20 07 .

MAY 2 3 2007

Judge Stuart M. Simons

Judge

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO. 99-18208 CA 20

ANA MARGARITA MARTINEZ,
      Plaintiff,

vs.

THE REPUBLIC OF CUBA,
      Defendant.
_____/

**AMENDED
FINAL JUDGMENT**

> RECORDED
> MAR 27 2001
> Clerk of Circuit
> & County Courts

THIS MATTER has been brought before the Court on 23rd of March, 2001, on the

Plaintiff's Motion to Amend Final Judgment which was rendered on March 9, 2001, and the

Court having reviewed the Motion for Amendment and the facts stated therein, and listened to

argument of counsel, amends the Final Judgement on behalf on the Plaintiff, Ana Margarita

Martinez and against the Defendant, Republic of Cuba.

    The Court reiterates without reciting again it findings of facts and law, and its conclusions

stated in the original order of March 9, 2001.

    The Court gives Compensatory Damages of $7,175,000.00 and for Punitive Damages in

the amount of $ *20,000,000.* — for which sum execution may issue forthwith against the

Defendant, Republic of Cuba, and against any of their assets wherever situated. The Court will

retain jurisdiction to enforce this judgment.

1

A TRUE COPY
CERTIFICATION

**DONE AND ORDERED** at the Circuit Court of the 11th Judicial Circuit in Miami Dade

County, Florida this _____23_____ day of March, 2001.

_Alan L. Postman_
Alan L. Postman
Circuit Court Judge

cc:    Scott W. Leeds, Esq.
       Fernando J. Zulueta, Esq.
       Republic of Cuba

MAY 21 2007

STATE OF FLORIDA, COUNTY OF DADE
I HEREBY CERTIFY that the foregoing is a true and correct copy of the
original on file in this office. MAY 21 2007 AD 20____
HARVEY RUVIN, Clerk of Circuit and County Courts
Deputy Clerk _Marshall_ 0330

2
OFF REC BK.
19563 PG 1691